IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ROY L. HALL, an Individual | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CV-03-386-S-BLW |
| | ) | |
| v. | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| GLENN'S FERRY GRAZING | ) | |
| ASSOCIATION, an Idaho Corporation, | ) | |
| MICHAEL HANLEY, an Individual, | ) | |
| DENNIS STANFORD, an Individual, | ) | |
| DARYL KECK, an Individual, and | ) | |
| MICHAEL STANFORD, an Individual, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INTRODUCTION

The Court, sitting without a jury, held a trial in this case ending August 11,

2006.  The Court took the matter under advisement pending review of further

materials submitted by the parties after the trial.  Those materials have now been

received and reviewed by the Court.

For the reasons expressed below, the Court finds that the fair value of

plaintiff Hall's 30 shares of GFGA stock as of September 8, 2003, was $749,370.

The Court declines to award attorney fees, interest, or the assessment fees sought

by Hall.  Issues regarding the terms and manner of payment shall be resolved in the

**Findings of Fact and Conclusions of Law – Page 1**

second half of these bifurcated proceedings.

## FINDINGS OF FACT

**Background of GFGA**

1.     Glenns Ferry Grazing Association (GFGA) was incorporated in Idaho in 1965.  *See Testimony of Keck.*

2.     The purpose of GFGA, according to its Articles of Incorporation, is to "engage in the business of providing . . . lands for grazing and recreational purposes in the State of Idaho . . . ."  *See Exhibit 2003.*

3.     While GFGA was incorporated as a non-profit corporation, it was not able to obtain tax exempt status from the IRS.  *See Exhibits 1013 & 1019.*

4.     As a result, income received by GFGA is subject to corporate income tax.  *See Testimony of Keck and Black.*

5.     Effective January 1, 1999, GFGA received a provisional tax-exempt status that it must maintain for 10 years before it can actually reap the benefits of being tax-exempt.  *Id.*

6.     GFGA currently owns 9,459 acres of deeded land with 440 acres of decreed water rights.  *Id.; see also, Testimony of Brush & Richey.*

7.     The GFGA land is contained in 11 separate parcels, none contiguous, and some separated by several miles.  *See Exhibit 1114.*

8.      Over the years, GFGA has bought and sold land and associated grazing rights.  *See Testimony of Keck.*

9.      By 1994, there were only 5 shareholders in GFGA.  *See Exhibit 2021.*

10.    Three of those shareholders wanted to retire and sell their interests in GFGA. *See Exhibit 2048.*

11.    In 1998, GFGA retained accountant and business valuation experts from the Little Morris firm, and listed all of its real property and grazing rights for sale with ERA West Wind Realty.  *See Exhibit 1053 and Testimony of Daryl Keck.*

12.    No GFGA property was sold as a result of this listing.  *See Testimony of Black.*

13.    In 2000, shareholders Mike and Gloria Stanford sought to acquire 6 of the 20 shares held by fellow shareholder Ray Blair.  *See Testimony of Mike Stanford.*

14.    The Blairs did not accept the Stanford's offer at that time.  *Id.*

15.    By the beginning of 2001, GFGA had 111 shares held by 6 shareholders, allocated as follows:

**Findings of Fact and Conclusions of Law – Page 3**

| (1) | Jaca Brothers | 30 shares |
|-----|---------------|-----------|
| (2) | 06 Livestock (Stanfords) | 15 shares |
| (3) | Mike Stanford | 11 shares |
| (4) | Daryl Keck | 20 shares |
| (5) | Mike Hanley | 15 shares |
| (6) | Blair Estate | <u>20 shares</u> |
|     |              | 111 shares |

16.  On April 11, 2001, Hall signed an Earnest Money Agreement to purchase the Jaca Brothers Inc. ranch and its 30 GFGA shares. *See Exhibit 1002.*

17.  An appraisal of the 30 shares, done by Ken Brush for Hall and Hall's lender, appraised the 30 shares at $9,000 per share. *See Exhibit 2054.*

18.  On April 28, 2001, Hall was introduced to the GFGA shareholders at a shareholders meeting as a prospective buyer of the Jaca Brothers ranch.

**Blair & Keck Transactions**

19.  Before Hall closed on the Jaca ranch deal, he became aware of two ongoing transactions involving GFGA shareholders.

20.  The first transaction involved the Blair estate.

21.  Sometime in March or early April of 2001, the Blair estate received an offer for its 20 shares of GFGA stock of $216,000 from a third party. *See Testimony of Dennis & Ray Blair.*

22.  The second transaction involved Daryl Keck.

**Findings of Fact and Conclusions of Law – Page 4**

23.     Keck proposed trading his 20 shares for the Castle Creek property (also referred to as the Poison Creek property) and its grazing rights.

24.     Hall was aware that both of these transactions were approaching finalization before he closed on the Jaca ranch.

25.     On April 28, 2001, Hall was invited to attend a Special Meeting of the GFGA.  *See Testimony of Hall*.

26.     At that meeting it was unanimously approved that Hall be "accepted as a potential member based on the finalization of the sale of the [Jaca] ranch and cattle."  *See Exhibit 1034; see also Testimony of Hall.*

27.     On May 26, 2001, a special shareholders meeting was held.  *See Exhibit 1035.*

28.     Roy Hall was not yet a shareholder because his purchase of the Jaca Brothers ranch had not yet closed.

29.     Hall was not invited to this meeting and did not attend.

30.     At this meeting, the shareholders unanimously resolved to (1) exchange the Castle Creek property and associated grazing rights for Daryl Keck's 20 shares, and (2) exercise GFGA's right-of-first-refusal to acquire with the Stanfords the Blair 20 shares for $216,000.  *See Exhibit 1035.*

31.     Hall was made aware of this meeting.  *See Exhibit 2045.*

**Findings of Fact and Conclusions of Law – Page 5**

32.     Shortly after this meeting, Hall telephoned Keck and told him that he fully

        supported the exchange of Castle Creek for Keck's 20 shares.  *See*

        *Testimony of Keck.*

33.     Consistent with that phone call, Hall would later state in a letter to GFGA,

        dated January 20, 2003, that he did "approve" the Keck transaction.  *See*

        *Exhibit 2045.*

34.     In June of 2001, the Blairs received an increased offer from the third party of

        $234,000.  *See Exhibit 1063 (Bates number 000259).*

35.     Counsel for the Blair estate wrote a letter to GFGA informing them of the

        new offer and stating that the estate intended to sell the 20 shares to this

        third party for $234,000 unless GFGA matched that price.  *Id. (Bates*

        *number 000270).*

36.     On July 10, 2001, the GFGA responded with a letter from its attorney, Alan

        Schroeder, threatening suit unless the Blair estate tendered the 20 shares for

        the original price of $216,000 by August 17, 2001.  *See Exhibit 1063 (Bates*

        *numbers 000326-000328).*

**Closure of Hall's Purchase & "§ 1031 Exchange"**

37.     On July 24, 2001, Hall's purchase of the Jaca Brothers ranch closed.  *See*

        *Exhibits 1004 & 1009.*

**Findings of Fact and Conclusions of Law – Page 6**

38.     Title to the Jaca Brothers ranch and the 30 shares was taken by R.H.

Investments LLC.  *Id.*

39.     Hall and R.H. Investments were engaging in a transaction known as a

"§ 1031 exchange," named after the IRS provision governing its execution.

40.     More specifically, they were engaging in a "reverse like-kind exchange."

41.     The transaction is governed by IRS Revenue Procedure 2000-37, which

states that "the exchange accommodation titleholder [R.H Investments] is

holding the property for the benefit of the taxpayer [Hall]."

42.     The parties entered into a written agreement stating that "[a]ccommodator

[R.H. Investments] will hold the property for the benefit of Exchanger [Hall]

in order to facilitate this exchange under Section 1031 and Rev. Proc. 2000-

37."  *See Exhibit 1 to Hall Declaration.*

## Final Approvals of Blair & Keck Transactions

43.     In the meantime, GFGA attorney Alan Schroeder counseled GFGA to

accept the higher Blair offer.  *See Testimony of Schroeder.*

44.     On September 14, 2001, a GFGA shareholder meeting was held to confirm

the redemption of the Blair shares for the higher price.

45.     Hall received notice of this meeting and attended.  *See Exhibit 1036.*

46.     On a 5 to 1 vote, with Hall the lone dissenter, the shareholders voted to pay

**Findings of Fact and Conclusions of Law – Page 7**

$234,000 for the Blair estate's 20 shares.  *Id.*

47.    On September 26, 2001, a GFGA directors meeting was held at which the
directors approved a formal resolution memorializing the May 26, 2001,
Blair redemption.  *See Exhibit 2038.*

48.    Hall was not invited to, and did not attend, the September 26, 2001, meeting.
*Id.*

49.    On October 5, 2001, a special meeting of the GFGA directors was held
where the Keck deal was approved.

50.    Hall was not invited to, and did not attend, the October 5, 2001, meeting.

51.    On November 9, 2001, the Blair transaction closed, with GFGA buying 14
shares and the Stanfords buying 6 shares.  *See Testimony of Blair.*

52.    On December 15, 2001, the Keck transaction closed.  *See Testimony of Keck.*

53.    The market value of the Castle Creek property and grazing rights at the time
the property was exchanged for Keck's shares was $500,000.  *See Exhibit
1112, at pp. 7-9; see also Testimony of Calhoun.*

## Jaca Share Certificate Re-Issuance

54.    Jaca Brothers Inc. remained the shareholder of record throughout 2001
because Hall had not tendered the Jaca shares for re-issuance in his name.

55.    In late December of 2001, GFGA's counsel Alan Schroeder learned that Hall

**Findings of Fact and Conclusions of Law – Page 8**

was not yet a shareholder of record.  *See Testimony of Schroeder.*

56.    At that time, Schroeder instructed GFGA's Secretary, Gayle Moore, to send

notices of the 2002 shareholders' meeting to shareholders of record.  *Id.*

57.    Thus, Moore sent the notice of a shareholders meeting set for January 21,

2002, to Jaca Brothers Inc. instead of Hall because Hall was not yet a

shareholder of record.  *See Testimony of Moore.*

58.    On January 4, 2002, Jaca's counsel sent the notice to Hall reminding him to

tender the Jaca stock for re-issuance in his name.  *See Exhibit 2041.*

59.    On March 11, 2002, Hall's counsel, Bud Yost, tendered the Jaca stock

certificates to GFGA with directions to transfer the Jaca stock to R.H.

Investments, explaining that R.H. Investments was holding title for the Halls

pursuant to their reverse like-kind exchange.  *See Exhibit 2091.*

60.    On March 21, 2002, Yost sent another letter to GFGA, correcting his earlier

letter and asking that the shares be reissued in Hall's name.  *See Exhibit

2092.*

61.    On March 22, 2002, Hall listed the Jaca ranch for sale.  *See Testimony of

Hall.*

62.    Hall recalls that he may have listed both the Jaca ranch and the GFGA stock.

*See Testimony of Hall.*

**Findings of Fact and Conclusions of Law – Page 9**

**Hall's Grazing in 2002**

63. With regard to the 2002 grazing season, Hall's attorney Bud Yost led Mike Sanford to believe that Hall would turn out about the same number of cattle – 150 head – as Jaca Brothers had turned out the year before. *See Testimony of Sanford.*

64. Hall was accordingly instructed to inform Mike Sanford of the date when Hall would turn out his 150 head. *See Testimony of Sanford*; *see also Exhibit 2152.*

65. Hall failed to inform Sanford of his turn-out date. *See Testimony of Sanford.*

66. Hall also failed to abide by his initial estimate, and turned out nearly twice as many cattle (292 head) without notice to Sanford. *Id.*

67. In late August or early September of 2002, Hall inspected his cattle and found what he described as the "worst grazing conditions I had ever seen." *See Testimony of Hall.*

68. Hall opened a gate so the cattle could go into another pasture, but could not complete the task of moving them because he had to return to Arizona. *Id.*

69. Hall had his son-in-law finish moving the cattle into the next pasture. *Id.*

70. Hall never complained to the Sanford about this event. *See Testimony of Sanford.*

**Findings of Fact and Conclusions of Law – Page 10**

71.   Mike Sanford testified that he was informed by a hired man that Hall had opened a gate in the south end of Battleground and his cattle were drifting into the next pasture.  *Id.*

72.   Sanford testified that he went to Battleground and found adequate feed and water in the middle and northern part of the pasture where there were two live streams.  *Id.*

73.   Battleground consists of 11,000 acres.  *Id.*

*74.*   Sanford's testimony on the condition of the middle and northern sections of the Battleground pasture is credible and persuasive.

75.   Hall's problems with grazing in 2002 were caused in equal part by poor conditions and his own failure to communicate.

76.   Hall himself failed to inform Sanford that he would be turning out cattle, and then, after his attorney led Sanford to believe that he would turn out about 150 head, Hall turned out almost twice that number without any advance notice to Sanford.

77.   When Hall encountered poor conditions in the southern part of the Battleground pasture, he again failed to communicate with Sanford, because he was in a hurry to return to Arizona.

78.   These grazing problems are typically worked out in negotiations, *see*

**Findings of Fact and Conclusions of Law – Page 11**

*Testimony of Sanford*, and there was good pasture available within Battleground.

79.     The evidence relating to Hall's 2002 grazing experience does not show (1) that Hall was being oppressed by others in control of GFGA (the "control group") in any way, or (2) that GFGA was a poor manager of grazing conditions generally on the GFGA property.

80.     At most, the evidence shows that a section of the Battleground pasture was in poor condition – while other sections were in good condition – and that Hall was failing to communicate with other members of GFGA.

## Hall's BLM Letter

81.     Hall complained about these conditions in a letter to the BLM sent shortly after the 2002 grazing season.  *See Exhibit 2121.*

82.     In that letter, Hall stated that he was contemplating suing the GFGA, and pointed out that "water was a problem in 2002" in the Battleground pasture and that the "stock tanks were marginal in 2002, starting in August."  *Id.*

83.     He also states that "[a]ll pastures should be managed with conservative numbers until the grazing situation improves."

84.     Hall had not given any advance notice to other GFGA members that he intended to make these critical comments to the BLM.

**Findings of Fact and Conclusions of Law – Page 12**

85.     This was a sensitive time for criticism because the BLM was conducting an environmental assessment of the GFGA grazing practices.  *See Testimony of Schroeder.*

**January 20, 2003 Shareholders' Meeting**

86.     On January 10, 2003, Hall sold a substantial part of the Jaca ranch, but not any part of his GFGA stock, with the closing to occur on April 11, 2003. *See Testimony of Hall*.

87.     On January 20, 2003, the annual GFGA meeting was held.

88.     Hall received notice and attended with this attorney, Bud Yost.  *See Testimony of Hall.*

89.     Both Hall and Yost had advance notice that changes to the Articles and By-Laws would be considered at this meeting because GFGA's counsel Alan Schroeder had sent drafts of those changes to both men.  *See Testimony of Schroeder.*

90.     The changes had been long-considered by Schroeder to remedy problems he had encountered over the years as GFGA's counsel.  *See Testimony of Schroder.*

91.     Neither Hall nor Yost complained during the meeting of the changes.  *See Testimony of Schroeder*.

**Findings of Fact and Conclusions of Law – Page 13**

92.    Changes in the bylaws were made on a 3 to 1 vote, with Hall the lone
       dissenter.

93.    The changes reduced the number of Directors from 5 to 3 and allowed non-
       members to serve as Directors.

94.    The changes also removed the conditions under which a member may own
       more than 30 shares.

95.    The changes were made upon the advice of GFGA's counsel Alan
       Schroeder.  *See Testimony of Schroeder.*

96.    The Court finds persuasive Schroeder's testimony that (1) he was not asked
       by any GFGA shareholder to make these changes, and (2) that he decided
       that the changes were necessary after his experiences with the Blair and
       Keck transactions in 2001 revealed that many corporate provisions were
       either obsolete and/or in need of revision to reflect GFGA's current status.
       *See Testimony of Schroeder.*

## O'Riordan's Request for Documents

97.    On July 11, 2003, Hall's new counsel, Hugh O'Riordan, sent a letter to
       GFGA's counsel Schroeder requesting a broad array of documents.  *See
       Exhibit 2197.*

98.    Schroeder was concerned that much of the request involved documents that

**Findings of Fact and Conclusions of Law – Page 14**

Hall's other counsel, Bud Yost, may already have, and also that the material requested was protected by the attorney-client privilege. *See Testimony of Schroeder.*

99.    Schroeder responded the next day, stating (1) that he will not respond until O'Riordan assures him that Yost does not already have the documents that he wants, and (2) that except for documents protected by the attorney-client privilege, GFGA probably already gave many of the requested documents to Hall. *See Exhibit 2198.*

100.    Schroeder never heard any response from O'Riordan and hence did not produce any documents. *See Testimony of Schroeder.*

101.    Schroeder's concerns were reasonable, and O'Riordan made no attempt to address those concerns or negotiate further.

102.    On September 9, 2003, Hall filed his complaint in this case seeking dissolution of GFGA.

**<u>Fair Value</u>**

103.    One method for evaluating the fair value of Hall's 30 shares of GFGA stock is the Adjusted Net Tangible Asset Method. *See Testimony of Cooper.*

104.    Under this method, tangible liabilities are subtracted from tangible assets, adjusted for market value. *Id.*

**Findings of Fact and Conclusions of Law – Page 15**

105.  The resulting figure represents the Adjusted Net Tangible Asset Value.  *Id.*

106.  That value is then divided by the number of outstanding shares, to obtain a per-share value.  *Id.*

107.  GFGA's primary assets are its land and associated grazing rights.

108.  Turning first to the land, the Court must determine the market value of that asset.

109.  In making that determination, the Court must determine the "Highest and Best Use" of the subject parcels.  *See Testimony of Calhoun.*

110.  The "Highest and Best Use" for the GFGA property is "transitional from livestock ranching to recreational uses."  *Id.*

111.  This means that buyers would be motivated not only by the potential of the land to support cattle grazing but also the potential of the land for recreational uses, including scenic amenities, hunting, proximity to urban areas, pride of ownership, and other factors.  *See Testimony of Calhoun; see also Exhibit 1112 at p. 56.*

112.  This analysis is consistent with the GFGA Articles of Incorporation, discussed above, that list its purposes as providing land not only for grazing but also for recreational purposes.  *See Exhibit 2003.*

113.  Supporting this conclusion are 13 comparable sales in the Owyhee County

area showing that while some of the tracts were purchased for livestock grazing, other tracts were purchased for recreational potential. *See Testimony of Calhoun; see also Exhibit 1112 at 61-77.*

114. While most of those comparable sales involve buyers who intended to maintain a cattle grazing operation, some of the sales were to buyers interested in recreational interests such as hunting and seclusion. *Id.*

115. A major legislative initiative to designate nearby lands as wilderness – the Owyhee Initiative authored by United States Senator Mike Crapo – raises the potential for land values in this area to reflect something other than the lands' capacity to support a grazing operation. *See Exhibit 1112 at p. 56.*

116. Moreover, there has been significantly increased recreation activity in the area, including boating, hunting, and motorized recreation. *Id.*

117. In addition, the property is about 3 hours from Boise, with its strong economy. The property therefore has the valuable recreational quality of being remote, but not too remote. *Id.*

118. While some of the tracts of the GFGA property are best for grazing, other tracts stand out as being particularly appealing to the recreational property market. *Id.* at p. 57.

119. GFGA is critical of Calhoun's analysis for overstating the amount of

**Findings of Fact and Conclusions of Law – Page 17**

meadow in his valuation.

120. For example, GFGA points out that while Calhoun found 2,343 acres of "meadow" (combining irrigated lands, meadow lands, and pasture lands) in the GFGA property, he only found 514 acres in his comparable.

121. The Court finds persuasive, however, Calhoun's testimony that he used aerial photos, BLM studies, and on-the-ground analysis to verify much of his characterization of the GFGA lands.

122. The Court therefore accepts as accurate Calhoun's analysis of the amount of meadow lands within the GFGA lands.

123. GFGA also points out that Calhoun lumped together pasture lands with meadow lands, thereby artificially increasing overall values.

124. While that is true (because pasture land is typically worth less than meadow land), Calhoun also included irrigated land together with meadow land, thereby reducing overall values (because irrigated land is typically worth more than meadow land). *See Testimony of Calhoun.*

125. The Court finds persuasive Calhoun's testimony that the overall effect of this method was not to artificially raise overall values.

126. The Court can find no error in that analysis.

127. As of September 8, 2003, the market value of the GFGA real property was

**Findings of Fact and Conclusions of Law – Page 18**

$2 million.  *See Testimony of Calhoun; see also Exhibit 1112 at p. 88.*

128.    As of September 8, 2003, the market value of the GFGA grazing permits was, as rounded, $300,000.  *See Testimony of Cooper.*

129.    Thus, as of September 8, 2003, the total value of GFGA real property and grazing permits was $2.3 million.

130.    After adding the value of personal property and farm credit stock, and subtracting liabilities, the net equity of GFGA as of September 8, 2003, was $2,107,541.  *See Testimony of Cooper.*

131.    Given that there were 77 outstanding GFGA shares on September 8, 2003, the equity value per share as of that date was $27,371.

132.    Hall owned 30 shares, and thus held a minority position in GFGA.

133.    An appropriate minority discount is 8.74 percent.  *See Testimony of Reinstein.*

134.    After application of the minority discount, the value of each share of Hall's 30 shares of GFGA stock is $24,979.[1]

135.    Based on these calculations, the fair value of Hall's 30 shares of GFGA stock as of September 8, 2003, was $749,370.

---

[1]  The Court explains its application of the minority discount in the Conclusions of Law section of this decision.

**Findings of Fact and Conclusions of Law – Page 19**

## CONCLUSIONS OF LAW[2]

136.  On September 9, 2003, when the complaint was filed, Hall had standing to sue because the § 1031 exchange – with R.H. Investments holding title for Hall – made him an equitable owner of the GFGA stock.  *See Federal Deposit Ins. Corp. v. Kerr*, 637 F.Supp. 828, 841 (W.D.N.C. 1986) (finding that equitable owner of stock has standing to challenge corporate waste and fraudulent liquidation).

137.  Hall brought this suit to dissolve GFGA pursuant to Idaho Code § 30-1-1430(2)(b) on the ground that those in control of the corporation were acting "in a manner that is illegal, oppressive, or fraudulent, and [that] irreparable injury to the corporation is threatened or being suffered by reason thereof."

138.  The other GFGA shareholders filed an election under Idaho Code § 30-1-1434 to purchase Hall's shares to avoid dissolution.

139.  Because the parties were unable to reach agreement on the value of Hall's shares, they applied to the Court under Idaho Code § 30-1-1434(4) to "determine the fair value of [Hall's] shares as of the day before the date on which the petition [for dissolution] was filed, or as of such other date as the

---

[2]  This section includes both pure conclusions of law where the Court sets forth applicable legal standards and mixed questions of law and fact, such as where the Court analyzes the facts under the appropriate legal standards.

**Findings of Fact and Conclusions of Law – Page 20**

court deems appropriate under the circumstances."

140.   The appropriate date for setting the "fair value" of Hall's shares under Idaho

Code § 30-1-1434(4) is September 8, 2003, the day before this suit was filed

by Hall.

141.   The comments to that statutory provision state that "the court should

consider all relevant facts and circumstances of the particular case in

determining fair value."

**Fair Value**

142.   The Court concludes that the Adjusted Net Tangible Asset Method is the

appropriate method in this case for determining the fair value of Hall's 30

shares of GFGA stock.  *See Testimony of Cooper*.

143.   Based on the discussion above where the Court adopted with some

modification the appraisals of Scott Calhoun and David Cooper, the Court

finds pursuant to Idaho Code § 30-1-1434(4), that the fair value of Hall's 30

GFGA shares as of September 8, 2003, was $749,370.

**Findings of Fact and Conclusions of Law – Page 21**

**Minority Discount**

144.   In reaching that fair value figure, the Court used a minority discount, as

discussed above, to take account of the fact that Hall was a minority

shareholder.

145.   Comment 4(b) to Idaho Code § 30-1-1434(4) states in pertinent part that

"[i]n cases where there is dissension but no evidence of wrongful conduct,

'fair value' should be determined with reference to what [Hall] would likely

receive in a voluntary sale of shares to a third party, taking into account his

minority status."

146.   In this case there was dissension but no evidence of wrongful conduct.

147.   Hall argues that the GFGA committed wrongful conduct by allowing

Michael Stanford to purchase 6 shares of the Blair stock at an below-market-

value price.  *See Hall's Trial Brief* at p. 8.

148.   However, the price paid by Stanford was set in the market place by a willing

seller (the Blair estate) and a willing buyer (GFGA) – that was the identical

price paid by Stanford.

149.   This is not evidence of wrongful conduct.

150.   Hall argues that after the Blair deal, the GFGA control group "consolidated

their voting power into a 75% super majority by excluding a potential new

shareholder." *Id.*

151.  Consolidating corporate voting power is not wrongful conduct.

152.  Finally, Hall argues that the control group used its consolidated power to "oppress Hall by failing to provide him with notice of corporate meetings and by changing the GFGA Articles of Incorporation and By-Laws to assure that Hall never served on the Board of Directors." *Id.*

153.  The changes to the Articles and By-Laws were based on the advice of attorney Schroeder who felt, after reviewing the Blair and Keck transactions in 2001, that many provisions were obsolete and in need of updating to reflect GFGA's current status. *See Testimony of Schroeder.*

154.  Drafts of the changes were provided in advance of the meeting to Hall and he was given an opportunity to object during the meeting itself, which he attended with his attorney.

155.  Under these circumstances, the Court cannot find that the changes to the Articles and By-Laws constitute wrongful conduct.

156.  With regard to the lack of notice, the failures to provide Hall with notice of shareholder meetings between October and December of 2001 was due in large part to understandable confusion over the fact that Hall was not a shareholder of record during this time, and did not have the Jaca shares re-

issued in his name until March of 2002.

157.  The lack of notice is not evidence of wrongful conduct or oppression.

158.  For these reasons, the Court finds that while there was dissension, there was

not wrongful conduct, and thus the minority discount should apply under

Comment 4(b) to Idaho Code § 30-1-1434(4).

159.  Hall points to the opinion of his expert, David Cooper, who testified that

"fair value" is a term of art for business valuation appraisers meaning a

shareholder's overall value in the corporation excluding the application of

any minority discount.  *See Testimony of Cooper*.

160.  Hall argues that while a minority discount might be proper for determining

"fair market value," the Idaho Code requires a finding of something different

– "fair value" – and that difference should be recognized and given the

meaning ascribed to it by Cooper.

161.  The Court disagrees for two reasons.

162.  First, the testimony showed that prices of GFGA stock sold in past

transactions did reflect a minority discount.  *See Testimony of Reinstein &*

*Cooper*.

163.  Second, Hall's argument ignores Comment 4(b), quoted above, which states

that in the absence of wrongful conduct, fair value should be determined by

taking into account a minority discount.

164.   Under the circumstances of this particular case, the Court finds that a

minority discount should be applied in determining fair value.

## **Probable Grounds**

165.   Hall may obtain an award of fees and costs "[i]f the court finds that [he] had

probable grounds for relief under section 30-1-1430(2)(b), Idaho Code."

166.   The Idaho Code section referred to in that quote allows for judicial

dissolution of a corporation if "[t]he directors or those in control of the

corporation have acted or are acting in a manner that is illegal, oppressive or

fraudulent, and irreparable injury to the corporation is threatened or being

suffered by reason thereof."

167.   Thus, to obtain an award of fees and costs, Hall must show that when he

filed this lawsuit on September 9, 2003, he had probable grounds to believe

that those in control of GFGA (1) were acting in a manner that was illegal,

oppressive or fraudulent, and (2) that this conduct threatened GFGA with

irreparable injury.

168.   The Court can find no evidence that Hall had probable grounds to believe

that GFGA was threatened with irreparable harm.

169.   In addition, the Court can find no evidence that Hall had probable grounds to

**Findings of Fact and Conclusions of Law – Page 25**

believe that those in control of GFGA were acting in a manner that was illegal, oppressive or fraudulent.

170.   Hall alleges that the following incidents support a finding that he *did* have probable grounds: (1) The Battleground pasture grazing incident in 2002; (2) the Blair and Keck transactions; (3) the failures to notify Hall of shareholders' meetings; (4) the changes to the Articles and By-Laws; and (5) the withholding of information by GFGA's counsel Alan Schroeder.  *See GFGA Post-Trial Brief* at pp. 13-14.

171.   With regard to the Battleground incident, Hall did not mention poor management of grazing lands in his complaint, and so this incident apparently did not prompt him to believe that GFGA was under threat of irreparable harm when he filed suit.

172.   At most, the Battleground incident showed poor management of a small section of a single pasture that otherwise had good conditions.

173.   There is no evidence of poor management of GFGA lands in general that threatened GFGA with irreparable injury.

174.   Hall did not make any effort to correct the problems he saw by communicating his concerns to any other GFGA member.

175.   While he wrote a letter to the BLM, he did so without consulting any other

**Findings of Fact and Conclusions of Law – Page 26**

GFGA member.

176.   Given all these circumstances, the isolated Battleground pasture incident could not serve as probable grounds for belief that the GFGA was threatened with irreparable harm.

177.   The Blair and Keck deals likewise provide no support for Hall.

178.   The Keck transaction was approved by Hall, as discussed above.

179.   The Blair transaction closed nearly two years before Hall filed this suit.

180.   Moreover, the Blair transaction was conducted at a price set by a third-party who made an arms-length offer.

181.   Hall purchased his shares with full knowledge of both transactions and without receiving any warranty of any kind concerning his GFGA shares.

182.   Given what Hall knew at the time he filed suit, the Blair and Keck transactions cannot serve as grounds for a finding of probable cause.

183.   The GFGA's failures to send notice to Hall of shareholder's meetings had ceased for over a year before Hall filed suit, and were due in large part to the understandable confusion caused by Hall not having the shares in his name.

184.   This was not an ongoing problem that was causing any type of irreparable harm at the time Hall filed this lawsuit, and thus cannot serve as support for a finding that he had "probable grounds" to believe GFGA was threatened

with irreparable harm.

185.   With regard to the changes to the Articles and By-Laws, there is nothing on their face that poses a threat of irreparable injury or even that would inevitably freeze out Hall from ever serving on the Board of Directors.

186.   If the changes were improperly instituted, Hall could have filed suit to set them aside, and the availability of that option means that the corporation was not faced with a threat of irreparable harm that required its dissolution.

187.   Comment 2(b) to Idaho Code § 30-1-1430 states that "[t]he court should be cautious in the application of these grounds [referring in part to the ground of irreparable injury] so as to limit them to genuine abuse rather than instances of acceptable tactics in a power struggle for control of a corporation."

188.   At most, the changes to the Articles and By-Laws were the result of a power struggle, and never posed a threat of irreparable harm to GFGA.

189.   With regard to the alleged stonewalling by GFGA counsel, the fact remains, as discussed above, that Hall's counsel never responded to GFGA's concerns, but instead filed this suit without any negotiation over the document request.

190.   The refusal to provide documents does not threaten irreparable injury.

**Findings of Fact and Conclusions of Law – Page 28**

**Estoppel & Probable Grounds**

191.  Hall argues that "he could neither confirm nor disprove his beliefs the
      Control Group was causing irreparable injury to GFGA [because of] Mr.
      Schroeder's stonewalling and assertion of attorney-client privilege against
      Mr. Hall."  *See Hall's Post-Trial Brief at p. 17.*

192.  Hall argues that because Schroeder did not produce the documents
      demanded in O'Riordan's letter of July, 2003, GFGA should be estopped
      from arguing that Hall did not have probable cause to bring this suit under
      Idaho Code § 30-1-1434(5).

193.  Idaho law requires a finding of "unconscionable" conduct to support the
      application of estoppel or quasi-estoppel.  *Thomas v. Arkoosh Produce, Inc*.,
      48 P.3d 1241 (2002).

194.  As discussed above, Schroeder had reasonable grounds to refuse to comply
      with O'Riordan's demands.

195.  O'Riordan failed to address Schroeder's concerns or negotiate in any
      manner.

196.  Under these circumstances, the Court cannot find that GFGA committed
      "unconscionable" conduct that warrants application of either estoppel or
      quasi-estoppel.

**Findings of Fact and Conclusions of Law – Page 29**

**Unjust Enrichment**

197.  Hall seeks the return of $44,081.11 that he paid in assessments to GFGA after this suit was filed, claiming that GFGA was unjustly enriched by his payments.

198.  The assessments were his *pro rata* share of litigation costs involving GFGA lands and incurred in other cases.

199.  There is no unjust enrichment, however, because his payment reduced GFGA liabilities, a benefit to GFGA reflected in the "fair value" of its shares, including Hall's 30 shares.

**Interest**

200.  The Court will not award interest until the remedy portion of these bifurcated proceedings is completed.

**Terms**

201.  The terms of payment shall be set in the second half of these bifurcated proceedings.

**Conclusion**

202.  Pursuant to Idaho Code § 30-1-1434(4), the fair value of Hall's 30 GFGA shares as of September 8, 2003, was $749,370.

203.  The Court declines to award attorney fees, interest, or the appraisal fees

**Findings of Fact and Conclusions of Law – Page 30**

sought by Hall.

204.   The parties are directed to contact the Court's Clerk, LaDonna Garcia, at

(208) 334-9021 to set up a hearing date for the second half of these

bifurcated proceedings.

DATED:  **September 21, 2006**



B. LYNN WINMILL
Chief Judge
United States District Court

**Findings of Fact and Conclusions of Law – Page 31**